IN THE UNITED STATES DISTRICT
COURT FOR THE EASTERN DISTRICT
OF TENNESSEE AT CHATTANOOGA

JOHN DOE, A MINOR,
THROUGH HIS PARENT
AND GUARDIAN,
MARY DOE,
and MARY DOE, individually.

*Plaintiff*

v.

PREP PUBLIC SCHOOLS,
f/k/a CHATTANOOGA PREP, INC.

*Defendant.*

Case No. 1:25-cv-00011
Judges McDonough/Steger

JURY DEMANDED

___

# PLAINTIFF'S THIRD AMENDED COMPLAINT

___

**COMES THE PLAINTIFF, JOHN DOE**, through his parent, Mary Doe, and counsel, submits this Third Amended Complaint and shows:

## I. PARTIES, JURISDICTION, AND VENUE

1. The Plaintiff is John Doe who is a citizen and resident of Hamilton County, Tennessee, where he attends public school. His case is brought through his natural parent, Mary Doe and she brings claims for herself, individually.

2. The Defendant, the Prep Public Schools, f/k/a Chattanooga Prep, Inc., ("Chattanooga Prep"), is a Non-Profit Corporation, a charter school located in Hamilton County, established under Tenn. Code Annotated §49-13-205 through the Tennessee Public Charter School Commission. It is organized under the laws of the State of Tennessee. And it is charged under those laws with the managing, controlling, and operating the public school for

the students that it serves. It receives federal funds and it is a governmental entity pursuant to T.C.A. § 49-13-105.

3. The Defendant may be properly served with process at their registered agent, Prep Public Schools, at 1849 Union Ave, Finance Office, Chattanooga, TN 37404.

4. This action arises out of the following federal statutes: Americans with Disabilities Act, 42 U.S.C. §12132 et. seq.; Section 504 of the Rehabilitation Act, 29 U.S.C. §794; Section 1983 and the First Amendment to the United States Constitution; the Equal Protection Clause of the Fourteenth Amendment; and the Substantive Due Process Clause of the Fourteenth Amendment to the United States Constitution. The Court's jurisdiction is invoked pursuant to 28 U.S.C. §1331.

5. Venue is appropriate in this Court under 28 U.S.C. §1391(b) as the cause of action arose in Hamilton County and the Defendant may be found in Hamilton County.

## II. FACTS

*John's Disability*

6. John Doe is 11 years old. He likes the Dallas Cowboys, Minions, and "plushies," those soft toys in the shape of animals.

7. John is not like most 11-year-olds. He has Autism Spectrum Disorder and an Intellectual Disability. As a result, his communication and social skills are severely impaired.[1] He

---

[1] "Autism is a neurodevelopmental disorder generally marked by impaired social and communicative skills, engagement in repetitive activities and stereotyped movements, resistance to environmental change or change in daily routines, and unusual responses to sensory experiences." 34 CFR §300.8(c)(1)(i).

has a "disability," as he is substantially limited in major life activities:[2] speaking, communicating, social interaction, cognitive function, and learning.[3]

8. Chattanooga Prep knows John and his disability. His educational record reflects his disability.

*John's Expression on September 25, 2024*

9. On Wednesday, September 25, 2024, in science class, at the end of the school day, John's classmate asked whether a fellow student was going to "blow up the school."

10. John answered "yeah" in reference to that other student. John had no information that such other student was *truly* intending to blow up the school. His expression of "yeah" was limited by his social awareness and judgment—his disability—if not hyperbole or misplaced attempt at humor.

11. John's teacher did not hear the question posed nor John's response. Nor did any other adults. But other children claimed that John, who has a disability, said *he* was going to "blow up the school," not the other student. That's equally invalid, as John had no ability, means, tools, intention, plan, motivation—*whatsoever*!—to blow up a school.

12. John's teacher told him to go to the principal's office. There, he met Chattanooga Prep's principal, Dr. Diamond Kelley. Dr. Kelley knew John and his disability. She fully understood that neither the other student nor John had any intention, capacity, tools,

---

[2] 42 U.S.C.S. § 12102(1)(A)

[3] Courts construe the term "disability" broadly. 42 U.S.C.S. § 12102(4)(A). As to the term "impairment," the applicable Department of Justice regulations provide that the term physical or mental impairment includes ADHD and dyslexia and other specific learning disabilities. 28 C.F.R. § 36.105(b)(2).

plans, or any motivation whatsoever to blow up the school. For that reason, she dismissed him home with the intention that he would return to school the following day. That should have been the end of it.[4]

*Reporting Invalid Threats to Law Enforcement*

13. But it wasn't the end of it. Chattanooga Prep lacked training on how to handle allegations of "threats of mass violence" under a Tennessee law. Instead of reporting only *valid* threats of mass violence to police, Chattanooga Prep reports all threats to law enforcement *regardless* of validity and regardless of intellectual disability. That decision severely harmed John Doe and his mother.

14. Despite knowing his disability, and that the threat was invalid (and that he was to return to school the next morning), Chattanooga Prep's principal reported John to law enforcement as if he *had* made a valid threat of mass violence. The report was made to its contracted Student Resources Officer, employed by the Sheriff's department, as having made a threat of mass violence—in spite of his Autism Spectrum Disorder, his intellectual disability, and in spite of knowing he made no valid threat at all.

*Chattanooga Prep Breaches Every Safeguard for John*

15. First, children with an intellectual disability are exempt from prosecution under the threat of mass violence law.[5] Indeed, for a threat to be punishable as a felony, the speaker must "recklessly" threaten mass violence.[6] This means that the speaker must be *aware* of a substantial

---

[4] Only "valid" threats of mass violence must be tendered to police. Tenn. Code Ann. §49-6-4301(a)(3).

[5] Tenn. Code Ann. §39-16-517(b)(2).
[6] Tenn. Code Ann. §39-16-517(b)(1).

and unjustifiable risk that others may perceive their speech as a threat of mass violence. And then, they must "consciously disregard" that risk. John, because of disability and his tender age, was not aware of the risk. Nor could he consciously disregard it.

16. Second, threats of *mass violence* are not any old threat. They are threats "*a reasonable person* would conclude could lead to the serious bodily injury … or the death of two or more persons."[7] The principal had ruled that out—sending John home to return the next day.

17. Third, only if the threat is *valid* must the student be reported to law enforcement.[8] And only if the threat is *valid* must the student be expelled or removed from school.[9] Again, the principal ruled out a valid threat.

18. Fourth, even if the law applied to John (and it does not), and even if Chattanooga Prep's principal believed John's speech was a "valid" threat of mass violence (and it did not), *even then,* a threat assessment must be performed to determine validity.[10]

19. Threat assessment teams are used to distinguish transient (invalid) threats from valid threats of mass violence. The threat assessment team's purpose is "to develop comprehensive intervention-based approaches to prevent violence, manage reports of potential threats, and create a system that fosters a safe, supportive, and effective school environment."[11]

---

[7] Tenn. Code Ann. § 39-16-517 (a)(1).

[8] Tenn. Code Ann. §49-6-3401(g)(5), (6)

[9] *Id.*

[10] Tenn. Code Ann. §49-6-4301(a)(3).

[11] Tenn. Code Ann. §49-6-2701(a).

20. These threat assessment teams are not new.[12] They must include both "law enforcement personnel" and LEA representatives working in concert. This is far different than law enforcement performing a probable cause charging decision. As a threat assessment team member, law enforcement collaborates with school personnel and receives access to otherwise confidential educational records such as, in John's case, information *about his disability*.[13] Law enforcement officers are not medical or psychological professionals and, unless part of the threat assessment team, the educational records are confidential under federal privacy law (FERPA). This ensures that only *valid* threats of mass violence are reported to law enforcement for potential prosecution of a crime.

21. That's not what happened. Chattanooga Prep never performed a threat assessment.

22. As mentioned, although the principal rejected a threat of mass violence (without a threat assessment team), the principal brought in law enforcement (the Student Resource Officer) anyway. Law enforcement, the SRO, created an incident report that squarely states: "I was informed by the school's principal of a report of mass threats on school property."

23. Chattanooga Prep did not ask the law enforcement officer to sit as a threat assessment team member, to determine a threat-severity level, or to operate within the confines of student-records under FERPA. Nor did it ask consent from John's parent to share his educational records with law enforcement.

---

[12] Tenn. Code Ann. §49-6-2701(a).

[13] *Id.* at (b).

24. Acting in a traditional law enforcement capacity, not as a threat assessment team member, the SRO received from Chattanooga Prep *children's* statements. These children said that John, who has a disability, said *he* would shoot up the school. Law enforcement made the decision to arrest John and charge him with a felony, without a threat assessment team ever being assembled, and without the officer participating on any threat assessment team.

25. With Chattanooga Prep reporting an *invalid* threat of mass violence by John, without convening a threat assessment team with access to disability records, Chattanooga Prep placed law enforcement in the position of having three children's statements of a threat of mass violence. This kneejerk process creates the likelihood, if not certainty, that innocent children are arrested and charged with a felony for invalid threats or, as in this case, statements made due to disability under a law *for which they are exempt*. Put simply, Chattanooga Prep is criminalizing clearly non-threatening speech by tendering it to law enforcement without a threat assessment team and without regard to its own conclusions about validity.

26. Law enforcement found John at a birthday party at Logan's Roadhouse with his mother. The deputy called him outside, arrested him, and took him by car to the juvenile detention center. The experience was shattering for John, a student with a disability, and his mother, a bystander who witnessed it directly. He experienced bruising, cuts, and scrapes plus trauma of the event.

27. The next morning, Thursday, September 26, 2024, an apoplectic Dr. Kelley, the principal, realized that her report (an *invalid* report of mass violence without a threat assessment team) resulted in John's arrest.

28. Dr. Kelley phoned John's mother to apologize. She placed the blame on law

enforcement to whom *she* submitted the invalid threat. Dr. Kelley said she "cussed him up and down so bad that he should still feel it this morning." But it was too late. John had been handcuffed and charged with a felony, needed representation, and was missing school, due to Dr. Kelley's *invalid* report of a threat of mass violence against a student with a disability.

29. Although Friday was a school day, Dr. Kelley instructed John not to return to school until the following Monday, removing him from school for 1.5 days.

*Injunctive Relief and Training is Necessary*

30. Adequate training for school personnel is necessary to understand reporting of *valid* threats of mass violence to law enforcement—not any old threat of middle school students, regardless of context and regardless of disability. Invalid (transient) threats can be quickly and readily resolved (as it was here by Dr. Kelley) because the threat is an expression of feelings that do not reflect a substantive intent to harm someone.[14]

31. Chattanooga Prep must report a "*valid threat of mass violence*" to law enforcement. And it's "valid" if "such a determination is made based on the results of the threat assessment..."[15]

32. The Comprehensive School Threat Assessment Guidelines (CSTAG) is an evidence-based model for schools to use in conducting threat assessments in K-12 schools.[16]

---

[14] See the Comprehensive School Threat Assessment Guidelines (CSTAG) Available at https://education.virginia.edu/documents/yvpcomprehensive-school-threat-assessment-guidelines-overviewpaper2020-05-26pdf (last visited March 27, 2025). In a field test of these guidelines in 35 primary and secondary schools that responded to 188 threats of violence, approximately 70 percent of the cases were resolved as transient threats. *Id.*

[15] Tenn. Code Ann. §49-6-4301(a)(3).

[16] Available at https://education.virginia.edu/documents/yvpcomprehensive-school-threat-

Preliminarily, it recognizes that: "Youth frequently make threatening statements that are not serious and engage in aggressive behavior that ranges from horseplay to serious assault. It is important not to over-react."[17] Thus, CSTAG uses the threat assessment to distinguish "transient threats," a broad category of threats—"most threats"—which do *not* reflect a genuine intent to harm others.[18]

33. Chattanooga Prep's failures were entirely foreseeable. Unleashing an invalid threat of mass violence to law enforcement, outside of a threat assessment team, can have tragic consequences. As it did here. Chattanooga Prep placed the officer in a position of having three reports of mass violence without access to educational records. The field-study-tested CSTAG utilizes safeguards for statements which are *not a threat,* and for students with disabilities, like John, and it is consistent with Tennessee law:

*[See graphic next page]*

---

assessment-guidelines-overviewpaper2020-05-26pdf (last visited March 10, 2025)

[17] *Id.*

[18] *Id.*



34. Accurately distinguishing between transient and substantive threats (invalid versus valid) avoids over-reacting to threats that are not serious while focusing attention on serious threats that merit protective action. But without training, Chattanooga Prep will continue referring all speech, regardless of context, disability, satire, or euphemism to law enforcement. This ensures

that students' rights under the First Amendment (statements which are *not* "true threats") are criminalized and, in this case, rights under disability and Equal Protection laws are abridged.

## IV. LEGAL CLAIMS

### Count 1. First Amendment and Section 1983

35. The First Amendment protects the right to free expression. A key exception concerns "*true threats*" of violence. "[T]he 'true' in that term distinguishes [true threats] from jests, 'hyperbole,' or other statements that, when taken in context, do not convey a real possibility that violence will follow (say, 'I am going to kill you for showing up late.')."[19] Doe's speech was not a "true" threat at all. And Chattanooga Prep knew it.

36. Nor did Doe's speech, as a person with a disability, in proper context, "substantially and materially disrupt" the learning environment.[20] He was not indecent, lewd, or vulgar with his speech. And Chattanooga Prep's principal did *not* believe John was a true threat. Indeed, Chattanooga Prep brought him back to school and did not even bother with a "manifestation determination."

37. Chattanooga Prep's decision to report Doe to law enforcement under these circumstances and, then, to remove him from school for 1.5 days, violates the First Amendment. Additionally, under Section 1983, Chattanooga Prep was deliberately indifferent by failing to train its decision-makers about not reporting as a crime what it had concluded was obviously *not* a true and valid threat of mass violence. This caused Doe both educational and emotional harm.

---

[19] *Watts v. United States*, 394 U.S. 705, 708 (1969) in *Counterman v. Colorado*, 600 U.S. 66, 74 (2023).

[20] *Tinker v. Des Moines Indep. Comm. Sch. Dist.,* 393 U.S. 503 (1969).

38. Defendant, under color of state law, infringed on Doe's First Amendment rights and did so with deliberate indifference.

## Count 2: The Americans with Disabilities Act

39. Chattanooga Prep, a public entity, discriminated based upon Doe's disability. It referred him and his disability-affected speech to law enforcement—through its contracted relationship—while *knowing* that he made no threat of mass violence.

40. The ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; see also 28 C.F.R. § 35.130.

41. "In the ADA, Congress provided [a] broad mandate" to "effectuate its sweeping purpose[ to] ... forbid[] discrimination against disabled individuals in major areas of public life,[including] ... public services ...." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001). It is "a milestone on the path to a more decent, tolerant, progressive society." *Id.* (quoting *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 375 (2001) (Kennedy, J., concurring)).

42. Doe clearly has a "disability" due to his Autism Spectrum Disorder and/or Intellectual Disability.[21] And the regulations implementing Title II of the ADA state that [a] public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability . . . (i) Deny a qualified individual with a disability

---

[21] More specifically, the implementing regulations to ADA define an individual with a disability as follows: "(a)(1) Disability means, with respect to an individual: (i) A physical or mental impairment that substantially limits one or more of the major life activities of such individual; (ii) A record of such an impairment; or (iii) Being regarded as having such an impairment . . . ." *Id.* § 35.108.

the opportunity to participate in or benefit from the aid, benefit, or service; (ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others; (iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others; (iv) Provide different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others; . . . [or] (vii) Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service. *Id.* § 35.130(b)(1)(i), (ii), (iii), (iv), (vii).

43. Further, "[a] public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration: (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; or (iii) That perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State." *Id.* § 35.130(b)(3).

44. Thus, the regulations implementing Title II of the ADA require that public entities avoid unnecessary policies, practices, criteria or methods of administration that have the effect or tendency of excluding or discriminating against individuals with disabilities. *Id.* §§ 35.130(b)(3),

(8). By referring invalid threats as valid threats, ones occasioned by disability, to law enforcement as if a felony, Chattanooga Prep violated Doe's rights under the ADA.

45. Additionally, Title II regulations require public entities to "make reasonable modifications" to their programs and services "when the modifications are necessary to avoid discrimination." 28 C.F.R. § 35.130(b)(7)(i). In this case, Chattanooga Prep requires training, policy exclusions, and/or modifications for behaviors that are a manifestation of disability. It must conduct threat assessments to determine validity of threats, not just invoke law enforcement. And when it does invoke law enforcement, disability still matters. It must obtain consent to provide disability-related information to law enforcement to prevent wrongful arrests.

46. Defendant engaged in intentional discrimination through gross misjudgment, and also failed to reasonably modify its policies and practices for John Doe's disability. It discriminatorily reported John to law enforcement who then arrested him.

47. Chattanooga Prep also discriminatorily removed John from school. And it failed to modify its policies and procedures to ensure that such reporting and arrests for a child with a disability do not occur.

### Count 3. Section 504 of the Rehabilitation Act

48. Section 504 is a federal law that protects individuals with disabilities in programs and activities that receive federal financial assistance. 29 U.S.C. § 794; 34 C.F.R. §§ 104.1, .4. Specifically, Section 504 states that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . " 29 U.S.C. § 794(a). Thus, Section 504 applies to all

school districts that receive federal financial assistance. *Id.* § 794(b)(2); 34 C.F.R. § 104.31. Section 504, too, requires provision of reasonable modifications. 29 U.S.C. 794(a); 28 C.F.R. §41.53.

49. A student with a disability satisfies the definition of a "qualified handicapped person" if the student "(i) has a physical or mental impairment which substantially limits one or more major life activities [such as thinking or learning], (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." 34 C.F.R. § 104.3(j). Doe meets this criteria due to his Autism Spectrum Disorder and/or Intellectual Disability.

50. Doe is a qualified individual with a disability; the Defendant is subject to the ADA or the Rehabilitation Act; and he was denied the opportunity to participate in or benefit from the Defendant's services, programs, or activities, or was otherwise discriminated against by the defendants because of his disability, or though reasonable modifications to avoid said discrimination.

51. For matters of discipline, schools must avoid discrimination based upon one's disability. Thus, they must make reasonable modifications to their criteria, policies, practices or procedures when necessary to avoid discrimination on the basis of disability. 34 C.F.R. § 104.4 (Section 504 regulation prohibiting disability discrimination).

52. Defendant engaged in intentional discrimination through gross misjudgment, and also failed to reasonably modify its policies and practices for John Doe's disability. It discriminatorily reported John to law enforcement who then arrested him.

53. Chattanooga Prep also discriminatorily removed John from school. And it failed to modify its policies and procedures to ensure that such reporting and arrests for a child with a disability do not occur. See 34 C.F.R. § 104.4 (1),(4); see 28 C.F.R. § 35.130(b)(3),(7).

## Count 4. Equal Protection

54. Section 1983 provides a cause of action for an individual whose constitutional or federal rights are violated by those acting under color of state law:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

42 U.S.C. § 1983.

55. John Doe is a United States citizen with rights under Section 1983. "The Equal Protection Clause prohibits discrimination by government which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference." *Rondigo, L.L.C. v. Township of Richmond*, 641 F.3d 673, 681-82 (6th Cir. 2011).

56. The clause is "essentially a direction that all persons similarly situated should be treated alike." *EJS Properties, LLC v. City of Toledo*, 698 F.3d 845, 864 (6th Cir. 2012)(quoting *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985).

57. Chattanooga Prep treated Doe differently *because of* a disability. His thoughts, language, and expressions were disability linked—"manifested"—but instead of relieving him of a report to prosecution, CHATTANOOGA PREP reported him anyway. CHATTANOOGA PREP's training program on threats of mass violence, and on threat assessments, are clearly inadequate for the tasks required. It acted arbitrarily, irrationally, and unconstitutionally.

For relief, Plaintiffs seek:

a. Declaratory relief of the Constitutional violations.

b. Injunctive relief to include training related to the correct application of Tennessee's mass violence law, including training on threat assessments to distinguish transient threats and threats by students with disabilities, to avoid violation of disability laws, First Amendment, and the Constitution.

c. Injunctive relief enjoining Defendant from using its protocols to report Doe for a crime for disability-manifested speech or for a crime of mass violence for speech that is *not* a valid threat of mass violence.

d. Reasonable modifications of CHATTANOOGA PREP policies, procedures, and practices to account for Doe's disability and manifestations of his disability, including not reporting transient or invalid threats as potential crimes. This also includes creating valid procedures for threat assessment teams and the complementary use of SROs/law enforcement personnel who operate inside the schools.

e. Compensation for humiliation, mental anguish, and damage to Doe's reputation.[22]

f. Compensation for humiliation and mental anguish to Mary Doe.

g. Compensation for any interim costs of education.

---

[22] A plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations. *Smith v. Wade*, 461 U.S. 30, 52 (1983) ("Compensatory damages … are mandatory.").

    h.   Nominal damages for the Constitutional violations.[23]

    i.   Attorneys' fees and costs. 42 U.S.C. §1988(b); 42 U.S.C. §1983.

    j.   A jury is demanded for all claims triable by jury.

Respectfully submitted,

/s Justin S. Gilbert
Justin S. Gilbert
Gilbert Law, PLLC.
100 W. Martin Luther King Blvd, Suite 501
Chattanooga, TN 37402
Telephone: 423-756-8203
justin@schoolandworklaw.com

&

/s Buddy B. Presley
Buddy B. Presley, Jr. (BPR #013921)
1384 Gunbarrel Rd, Suite A
Chattanooga, TN 37421
(423) 826-1800
bpresley@presleylawfirm.com

**CERTIFICATE OF SERVICE**

On May 27, 2025, I served the Third Amended Complaint upon counsel of record, Caitlin Burchette, through the Court's ECF filing system, along with my co-counsel, attorney Buddy Presley:

**LEWIS THOMASON**

Caitlin Burchette
900 S. Gay St.
Suite 300
Knoxville, TN 37902
P.O. Box 2425
Knoxville, TN 37901
cburchette@lewisthomason.com

**COUNSEL FOR DEFENDANT**

---

[23] *Carey v. Phiphus*, 435 U.S. 247, 266-67 (1978).

Buddy B. Presley, Jr. (BPR #013921)

1384 Gunbarrel Rd, Suite A  
Chattanooga, TN 37421  
(423) 826-1800  
bpresley@presleylawfirm.com

**CO-COUNSEL FOR PLAINTIFF**

/s Justin S. Gilbert